# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 31, 2013

## IN RE STEPHEN B. ET AL.

**Appeal from the Juvenile Court for Campbell County**
**No. J2012-279     Joseph M. Ayers, Judge**

_____

**No. E2012-02575-COA-R3-PT-FILED-JULY 31, 2013**

_____

This is a termination of parental rights case focusing on the minor children ("the Children") of Tammy S. ("Mother"). Upon order of the Campbell County Juvenile Court entered September 19, 2011, the Children were taken into emergency protective custody by the Tennessee Department of Children's Services ("DCS") due to unsanitary conditions in the family home and concerns regarding inappropriate supervision and medical neglect of one of the Children. DCS filed a petition seeking to terminate Mother's parental rights on July 11, 2012. The petition alleged several statutory grounds for termination, including abandonment based on willful failure to visit the Children, abandonment based on failure to provide a suitable home, persistent conditions, and substantial noncompliance with the permanency plan. Following a bench trial conducted October 4, 2012, the trial court terminated Mother's parental rights after finding by clear and convincing evidence that (1) Mother had abandoned the Children due to her failure to provide a suitable home, (2) Mother had failed to substantially comply with the permanency plan, and (3) the conditions leading to the Children's removal persisted. The trial court further found that termination of Mother's parental rights was in the Children's best interest. Mother has appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Jordan Long, Knoxville, Tennessee, for the appellant, Tammy S.

Robert E. Cooper, Jr., Attorney General and Reporter, and Leslie Curry, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's

Services.

## OPINION

### I. Factual and Procedural History

Mother has two minor children: Stephen, now age ten, and Tyler, age three. DCS has been significantly involved with this family for several years, dating back to at least 2004. DCS received numerous referrals regarding Mother's oldest son, Austin, who attained the age of majority in 2011. The prior referrals concerning Mother involved allegations of environmental neglect, lack of proper supervision, medical neglect, physical abuse, and substantial risk of sexual abuse. Custody of Austin and Stephen was judicially removed in 2004 due to medical neglect and environmental issues. In approximately 2008 or 2009, Austin and Stephen began living with their maternal aunt and uncle, with Mother residing there intermittently. In 2010, Austin reported to DCS that his stepfather, Lewis S., hit him in the back and also struck another minor who was visiting in the home.[1]

DCS Child Protective Services received a report approximately one week later that Lewis S. had physically assaulted Mother in the presence of Tyler. At that time, Mother and Lewis S. were lodging in a motel with Tyler. Mother reported that she and Lewis S. had argued regarding their finances. The incident resulted in Lewis S. throwing a bottle toward her. When Mother attempted to use the telephone to call for help, Lewis S. seized the telephone and wrapped the cord around Mother's neck.[2] At this point, DCS petitioned the Juvenile Court for a restraining order prohibiting Lewis S. from having any contact with the Children. A no-contact order was entered. The Child Protective Services ("CPS") worker assigned to the case discussed the ramifications of the order with Mother and Lewis S. The CPS worker also explained generally the process Lewis S. should follow to have the order dismissed, which included completing an anger management course, obtaining a mental health evaluation, and attending parenting classes. Lewis S. was also required to undergo an alcohol and drug assessment, having recently tested positive for marijuana and methamphetamine.

On September 13, 2011, CPS received a separate referral regarding Stephen. Stephen's school reported that he had been experiencing an ongoing problem with defecating

---

[1] Lewis S. is the biological father of Tyler but not the biological father of Mother's other two children. Lewis S.'s parental rights regarding Tyler were terminated in a separate judicial proceeding.

[2] Mother later recanted her story regarding the telephone, but both she and Lewis S. admitted that he threw a bottle at her.

on himself several times daily. The school also noted being unable to contact anyone from the child's family to bring clean clothes. With reference to the referral, the CPS worker went to the school to interview Stephen. Stephen related that his stomach hurt constantly, and that when he reported this problem to his aunt and Mother, they did not believe him. When the CPS worker subsequently visited the home to interview Mother, she found the conditions of the aunt's home where the Children were residing to be deplorable. She described the presence of cockroaches "everywhere," stating that the family's food supply was infested. The Children were feeding themselves from cereal boxes that contained cockroaches. In addition, the bathroom presented a large hole in the floor; the toilet was filled with feces. The Children were dirty and unkempt, smelling of smoke and urine.

Further, Mother admitted to the CPS worker that she had been aware of Stephen's stomach condition for about one month, but due to not feeling overly concerned, "had not gotten around" to taking Stephen to the doctor. Mother acknowledged that custody of Austin had been removed in 2004 by reason of a similar problem when the child had to undergo a surgical procedure to have an impaction removed.

By order of the Juvenile Court, the Children were taken into protective custody by DCS. They were subsequently adjudicated dependent and neglected due to their living conditions and because Mother had attempted to "reunify the children with Lewis [S.] against whom there is a no contact order." A permanency plan was developed on October 19, 2011, wherein Mother was required, *inter alia*, to visit the Children at least 4.3 hours per month, obtain a mental health assessment and follow any recommendations, abide by the no-contact order entered against Lewis S., complete parenting classes, and demonstrate appropriate parenting skills. A second permanency plan was developed in May 2012, which plan contained substantially identical parental responsibilities.

DCS filed a petition seeking termination of Mother's parental rights on July 11, 2012. The petition alleged several grounds for termination, including abandonment based on willful failure to visit the Children, abandonment based on failure to provide a suitable home, persistent conditions, and substantial noncompliance with the permanency plan. Following a bench trial on October 4, 2012, the trial court terminated Mother's parental rights upon finding by clear and convincing evidence that (1) Mother had abandoned the Children due to her failure to provide a suitable home, (2) she had failed to substantially comply with the permanency plans, and (3) the conditions leading to removal persisted. The trial court further found that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred in finding that Mother was in substantial noncompliance with the permanency plans.

2. Whether DCS made reasonable efforts to reunite Mother and the Children.

3. Whether the trial court erred in finding that the conditions leading to removal still persisted at the time of trial.

4. Whether the trial court erred in finding that Mother abandoned her Children by failing to provide a suitable home.

5. Whether termination of Mother's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

### IV. Substantial Noncompliance with Permanency Plans

The trial court, *inter alia,* terminated Mother's parental rights on the statutory ground that she failed to substantially comply with the reasonable responsibilities set out in her permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) (Supp. 2012) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

. . .

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4.

The permanency plans in this case required Mother to: (1) visit the Children regularly

each month, (2) obtain a mental health assessment and follow any recommendations, (3) abide by the no-contact order regarding Lewis S. and the Children, and (4) complete parenting classes and demonstrate appropriate parenting skills.

In its findings regarding Mother's efforts under the permanency plans, the trial court stated in relevant portion:

> Both permanency plans provided that [Mother] would obtain a mental health evaluation. DCS testified that [Mother] had a prior mental health assessment from a previous case and they told her she could use that mental health evaluation if the documentation was provided. [Mother] and DCS testified that [Mother] previously signed a medical release for Ridgeview. Both plans further provided that [Mother] would participate in parenting classes. Testimony indicated that she has completed the parenting classes.
>
> [Mother] did not make any efforts, until recently, to obtain stable housing. She continued to reside in the home where the children were removed for a period of time. She also lived with friends and in other locations that had bed bugs. She did not make any attempts at finding a home until August, 2012. She testified that she knew she needed a home but was financially unable to do so until recently. [Mother] testified that she recently obtained employment and would receive her first paycheck soon. [Mother] has been with Lewis [S.] on most occasions when DCS has been to visit. She claims they are divorcing, however, she has no proof of said divorce. [Mother] and Lewis [S.] have never made any attempt to have the no contact order lifted. Further [Mother] appears to have the attitu[de] that Lewis [S.] should be allowed around the children. [Mother] has stated that her current home is not appropriate for the minor children. Although the expected outcome achievement date is November 14, 2012, there is little likelihood that [Mother] will complete all of the goals on the permanency plan. [Mother's] home cannot be suitable as long as Lewis [S.] is in the home, and he has failed to resolve his own issues. That alone, is a fundamental requirement in this case. Therefore, [Mother] is in substantial noncompliance with the permanency plan and DCS has established by clear and convincing evidence that the Respondent has failed to substantially comply with the permanency plans developed in this case.

The proof adduced at trial supports these findings. Mother was required to obtain a mental health assessment and follow all recommendations. She expressed a desire to utilize a mental health assessment she had obtained before the Children were removed from her custody to satisfy this requirement. The evidence established that she never offered any

documentation regarding this prior assessment to DCS, and she never provided any proof regarding same at trial. The only assessment that Mother demonstrated having completed was accomplished on August 23, 2012. This was more than a month after the termination petition was filed and nearly one year after the Children were taken into protective custody. Evidence of this assessment, however, was never supplied to DCS.

Mother reported to the DCS family service worker that she had been attending therapy at Ridgeview. When the DCS worker attempted to verify this information, she was informed that Mother had not attended Ridgeview since prior to the Children's removal. Further, Mother had never completed therapy; she had simply stopped attending sessions. The DCS worker testified that she repeatedly reminded Mother of the need to have a new assessment performed because she believed it was the most important requirement in the permanency plans. She attempted to provide Mother with referrals for completing this task. Mother refused the assistance, stating that she would simply return to Ridgeview.

Similarly, the plans required Mother to abide by the 2010 no-contact order regarding Lewis S. and the Children. Although Mother represented to DCS that she and Lewis S. were working with an attorney to seek its dismissal, the no-contact order remained in effect at the time of trial. The evidence established that Mother was still living with Lewis S. intermittently throughout these proceedings. She also had forced Stephen to talk to Lewis S. on the telephone, telling him they were going to be a "big happy family again." Furthermore, Mother delivered a greeting card to the Children during a visit that was signed, "Love Mommy and Daddy." Mother voiced her lack of understanding as to why the no-contact order was in effect. Her testimony clearly demonstrated that she held no intention of abiding by the court's directive.

As the trial court determined, Mother also failed to obtain alternative housing until approximately two weeks before trial. Even then, as she conceded, the home was not suitable for the care of the Children by reason of a lack of furniture other than a couch. The DCS family service worker stated that this apartment likewise presented evidence of cockroaches and that a meager amount of food was observed when she visited. Although the requirement of having suitable housing was not explicitly listed in the permanency plans, such was certainly implied, as the plans referenced the Children's removal due in part to environmental concerns. The environmental conditions and housing were identified as obstacles to reunification. Mother testified that she understood her responsibility to obtain proper housing to regain custody of the Children.

Mother was also required to visit regularly with the Children, at least 4.3 hours per month. She failed to do so. As the DCS family service worker explained, Mother accomplished no visits between March 14, 2012, and June 11, 2012. In the months preceding

this time frame, Mother attended an average of one visit per month, often failing to appear for visits or canceling at the last minute. The DCS worker could not locate Mother to schedule a visit for August 2012. Mother also failed to appear for a scheduled visit in September 2012. Therefore, the only permanency plan requirement with which Mother complied was the completion of parenting classes. DCS arranged and paid for these classes to be performed in Mother's home. Despite completing the classes, Mother failed to engage the Children during visitation or otherwise demonstrate appropriate parenting techniques. The evidence in this case does not preponderate against the trial court's determination, by clear and convincing evidence, that Mother's parental rights should be terminated upon the statutory ground of substantial noncompliance with the permanency plans.

## V. Reasonable Efforts by DCS

Mother contends that DCS did not make reasonable efforts to reunify her with the Children. As this Court has previously stated:

> [I]n the absence of aggravating circumstances, [DCS] is statutorily required to make reasonable efforts to reunite a family after removing children from their parents' custody. Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005); *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *9 (Tenn. Ct. App. Aug.16, 2004), perm. app. denied (Tenn. Nov. 8, 2004); *In re C.M.M.*, 2004 WL 438326, at * 7. Because of this obligation, the Department must not only establish each of the elements in Tenn. Code Ann. § 36-1-113(g)(3)(A), it must also establish by clear and convincing evidence that it made reasonable efforts to reunite the family and that these efforts were to no avail. *In re C.M.M.*, 2004 WL 438326, at *7 n. 27, *8.

> While the Department's reunification efforts need not be "herculean," the Department must do more than simply provide the parents with a list of services and send them on their way. *In re C.M.M.*, 2004 WL 438326, at *7. The Department's employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan.

> For the purpose of proceedings such as this one, the Department's reunification efforts are "reasonable" if the Department has exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2005). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine

the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody.

*In re Giorgianna H.*, 205 S.W.3d 508, 518-19 (Tenn. Ct. App. 2006) (other internal citations omitted).

In the instant action, DCS made substantial efforts to reunite this family after removal of the Children from Mother's custody. DCS facilitated visits between Mother and the Children by transporting the Children, as well as assisting Mother with her own transportation through provision of a gas card and a referral to East Tennessee Human Resources Agency ("ETHRA"). DCS developed two permanency plans with Mother, providing her with a referral to obtain a mental health assessment. DCS arranged and paid for parenting classes to be performed in Mother's home. Additional departmental efforts included attempting to maintain contact with Mother when she could be located and often initiating contact to schedule visitation in the absence of communication from Mother. DCS explained the effect of the no-contact order to Mother as well as the steps necessary to seek its dismissal. Mother was repeatedly warned not to have Lewis S. involved with the Children. DCS made at least three home visits to Mother's residence. On one visit the worker was denied entry, allegedly due to bedbug infestation.

It should also be noted that DCS made substantial efforts to prevent removal of the children, all to no avail. *See* Tenn. Code Ann. §37-1-166. DCS had been involved with Mother for a number of years. During a prior custody episode, many services had been offered to Mother to support her efforts to appropriately parent the Children. The services provided in the past included instruction on how to properly clean house, prevent insect infestation, do laundry, and store food. In 2010, the assigned CPS worker met with Mother

and prepared a plan of tasks Mother needed to accomplish to improve her situation. The strategy included obtaining her eyeglasses, a driver's license, and a GED through her employment. The worker further provided Mother with information on how to fulfill these tasks. She later reported that after four months Mother had completed none of these responsibilities. Although the CPS worker put services in place for Mother to receive training on conflict resolution and budgeting, Mother failed to avail herself of such opportunities.

As stated above, parents also bear responsibility in making reasonable efforts to rehabilitate themselves and to remedy the conditions that necessitated removal of children from parental custody. *See Giorgianna H.*, 205 S.W.3d at 518-19. Mother utterly failed in this responsibility. Viewing the situation in its entirety, the trial court found that DCS had made reasonable efforts to assist Mother in reuniting her family. We agree. In significant measure, Mother did not take advantage of DCS's reasonable efforts. As this Court has previously stated:

> Reunification is a "two-way street," and the law does not require DCS to carry the entire burden of this goal. DCS cannot reasonably be expected to do everything for a parent.

*In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576 at *16 (Tenn. Ct. App. Oct. 13, 2008). We conclude that the efforts expended by DCS in this case were reasonable. This issue is without merit.

## VI. Persistent Conditions

Tennessee Code Annotated § 36-1-113(g)(3) provides the following as an alternate ground for termination of parental rights:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be

-10-

remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

By its order terminating Mother's parental rights, the trial court, *inter alia*, found that the requirements of this statutory section had been satisfied:

In the instant case, there is clear and convincing evidence that the conditions that led to the removal still persist. The minor children were removed due to environmental neglect issues in the home and the fact that the mother intended to take the minor children to reside with Lewis [S.] in violation of a Campbell County Juvenile Court Order. [Mother] still does not have an appropriate home for the children by her own admission. Further, although [Mother] has stated that she has filed for divorce from Lewis [S.], he is at the home every time DCS makes a home visit. [Mother] has stated that Lewis [S.] loves the children and she does not seem to understand why he cannot be around them. Further, the home still has roaches. There is little chance that these conditions will be remedied soon. DCS has made reasonable efforts to assist [Mother] to remedy the conditions.

The evidence supports these findings. The Children were removed from the home by court order on September 19, 2011, due primarily to the poor living conditions and Mother's failure to abide by the no-contact order regarding Lewis S. and the Children. At the time of trial over one year later, these conditions still persisted. Mother continued to live in the unsuitable home until late summer 2012, some nine to ten months following the Children's removal. The DCS worker visiting this home in May 2012 found similarly deplorable conditions to exist. Mother was subsequently homeless for a period of time. She did not apply for public housing until August 2012. Although obtaining an apartment approximately two weeks prior to trial with rent assistance from Ridgeview, she admitted that this residence was not suitable for the Children due to a lack of furniture. Mother also acknowledged that there was a cockroach concern when she moved into the apartment, a fact confirmed by the DCS worker who observed the situation when she visited the home two days before the termination trial. The DCS worker indicated that there was very little food in the home as well.

Further, Lewis S. was present in the home during the most recent visit by the DCS worker. This was also the situation during prior unannounced visits. The DCS worker

-11-

explained that Lewis S. was present often when she spoke to Mother by telephone. Although Mother maintained at trial that she was separated from Lewis S. and in the process of obtaining a divorce, there was no corroborating proof of this assertion. Mother's testimony demonstrated several significant facts, including (1) she and Lewis S. knew the steps necessary to seek dismissal of the no-contact order, but never pursued them; (2) she entertained the idea of moving to Florida with Lewis S. and the Children after the no-contact order was entered; (3) she continued to live with Lewis S. intermittently during the pendency of these proceedings; (4) she held a power of attorney for Lewis S. at the time of trial; (5) she continued to approach the Children on Lewis S.'s behalf; and (6) in May 2012, after Stephen disclosed sexual abuse allegations against Lewis S., she spoke to Stephen by telephone, telling him, "Lewis loves you, Lewis would never hurt you . . . why are you saying those things about him?"

From our review of Mother's trial testimony, we determine that she clearly did not understand or appreciate that Lewis S. presented a danger to the Children and therefore should not be in their company. Mother's representation that she was divorcing Lewis S. was not supported by the totality of the evidence. Mother repeatedly represented to the DCS worker during the pendency of the proceedings that she and Lewis S. intended to seek a dismissal of the no-contact order in order to live together. Mother did not take appropriate steps to remove Lewis S. from her life and appeared unwilling to do so. She had also failed, by her own admission, to maintain a home suitable for the Children by the time of trial. As such, it would not be safe for the Children to be returned to her. We conclude that the conditions leading to removal of the Children still persisted at the time of trial, more than a year following. We further conclude that those conditions were unlikely to be remedied at an early date such that the Children could be safely returned to Mother.

There was also sufficient proof that continuation of the parent-child relationship would greatly diminish the Children's chances of early integration into a safe, stable, and permanent home. The DCS worker testified that Stephen's stomach issues had resolved since being placed into state custody. After visiting with Mother, however, Stephen experienced significant regressive behavior, defecating on himself for the first time in months. He also acted out in aggression toward his brother. This proof demonstrates that continuation of the relationship with Mother would greatly diminish the Children's chances of early integration into a safe, stable, and permanent home. *See, e.g., State Dep't of Children's Servs. v. M.P.*, 173 S.W.3d 794, 807 (Tenn. Ct. App. 2005). The evidence in this case does not preponderate against the trial court's determination, by clear and convincing evidence, that Mother's parental rights should be terminated upon the ground of persistent conditions.

## VII. Abandonment by Failure to Provide a Suitable Home

Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2012) provides, as an additional statutory ground for termination:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(ii) (2010) defines abandonment, in relevant part, as:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.  The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department . . . .

By its order terminating Mother's parental rights, the trial court, *inter alia*, found that the requirements of this statutory section had also been satisfied:

> [Mother] did not make any efforts to provide a suitable home for the children

until after the Petition to Terminate Parental Rights was filed. She waited until August, 2012, to obtain her own apartment. She also waited until August, 2012, to get on any waiting lists for other possible residences. Prior to that time, she continued to reside in the home from which the children were removed, without resolving the environmental neglect issues in that home. She did not have stable housing for a period of time, and resided with friends. [Mother] testified that her current apartment is not currently appropriate for the minor children. She testified that there are currently roaches in the home and the home is without any furniture other than a couch. Further, one of the other homes where she resided had bed bugs. [Mother] stated that she filed [for] divorce from Lewis [S.], however, she did not have any documentation or proof that the divorce was filed. However, Lewis [S.] was at her home two (2) days before court, and he has been present on other occasions when the department visited. Her demeanor and testimony during trial indicates that she does not believe that there is anything wrong with Lewis. [S.] being around her children.

Again, the evidence supports these findings. Parental custody of the Children was removed in September 2011. The Children were subsequently found to be dependent and neglected at a hearing on November 10, 2011. As previously stated, DCS made reasonable efforts to assist Mother in establishing a suitable home for the Children during a period of more than four months following their removal. Mother, however, made no reasonable efforts to provide a suitable home. She instead demonstrated a lack of concern for the Children's home environment. Mother did not actively seek visitation with the Children, often did not appear at scheduled visits, and did not interact with the Children appropriately during such parenting time. Further, the proof showed that Mother seldom inquired as to the Children's welfare and did not attend medical or other appointments. Mother's lack of concern has been of such degree that it appears unlikely that she will be able to provide a suitable home for the Children at an early date.

Mother failed to make a reasonable effort to obtain a suitable home for the Children during the year the Children were in state custody before the termination trial. She obtained an apartment only two weeks before trial, this being two months after the petition to terminate her parental rights was filed. In addition, that apartment was not an appropriate home for the Children, as discussed at length in prior sections. We conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Mother's parental rights should be terminated upon the ground of abandonment by failure to provide a suitable home.

## VIII. Best Interest of Children

When a parent has been found to be unfit by establishment of a ground for termination, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (Supp. 2012) provides a list of factors the trial court is to consider when determining if termination is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for

-15-

the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In this case, the trial court appropriately made findings regarding the above-listed statutory factors, finding factors 1, 2, 6, and 7 to be determinative:

The Respondent has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the Respondent. The Respondent still has unresolved mental health issues as well as the need for a suitable home. The home is currently not ready for the children and Lewis [S.] is still an active participant in [Mother's] life. It would not be in the best interests of the children to return to the Respondent's care.

The Respondents have failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. [Mother] has not addressed her mental health issues, still does not have appropriate housing, and is still involved with Lewis [S.] even after DCS has provided some assistance before and after the removal of the minor children for over one (1) year. The minor child Stephen has disclosed that Lewis [S.] has sexually molested him. It is not safe for the minor children to reside in the home because [Lewis S.] is still present. Further, Lewis [S.] has had a domestic violence history that at least one of the minor children has witnessed. [Mother] does not seem willing or able to keep the minor children away from Lewis [S.].

These findings are supported by the evidence adduced at trial. We agree that Mother has not made a significant adjustment to her circumstances or conduct so as to make it safe for the Children to be with her. Further, due to the length of time DCS has been attempting to help Mother, an adjustment does not reasonably appear possible. Although Mother has visited with the Children, albeit not regularly, there was no proof that a meaningful relationship existed between Mother and the Children. A change of caretakers and physical environment would have a detrimental effect on the Children's emotional and psychological

well-being, based on Stephen's disclosure of possible abuse and his regression in behavior after visiting with Mother. As the trial court found, Mother appeared desirous of keeping Lewis S. as a part of her life, despite the previous physical abuse he inflicted upon her and her oldest child and despite the sexual abuse allegations voiced against him by Stephen.

Mother did not maintain a safe and suitable home for the Children. She also failed to comply with the requirement that she obtain a mental health assessment until approximately one month before trial; ostensibly, her mental health issues, if any, had not yet been addressed. Finally, there was no proof regarding whether Mother had paid any child support. Reviewing the evidence in light of the statutory factors, the trial court did not err in finding clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children.

## IX.  Conclusion

The judgment of the trial court terminating the parental rights of Mother is affirmed. Costs on appeal are taxed to the appellant, Tammy S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE